NOT FOR  PUBLICATION                                          [34, 37]_____

<div align="center">

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

</div>

_____

DEBRA L. BLIZZARD,                          :
                                            :       Civil Action No. 02-4722 (FLW)
       Plaintiff,                       :
                                            :
       v.                               :       **OPINION**
                                            :
EXEL LOGISTICS NORTH AMERICA,               :
INC., JANE DOE AND JOHN DOE,                :
                                            :
       Defendants.                      :
_____:

**APPEARANCES:**

For Plaintiff:
DENNIS K KUROISHI, ESQ.
7 E. KINGS HIGHWAY
MT. EPHRIAM, NJ 08059


For Defendant Exel Logistics North America, Inc.:
PATRICIA A. SMITH, ESQ. AND RICHARD SWARTZ, ESQ.
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
PLAZA 1000
MAIN STREET
SUITE 500
VOORHEES, NJ 08043-4636

**WOLFSON, United States District Judge**:

      This matter has come before the Court upon the cross-motions for summary judgment

filed by Defendant Exel Logistics North America, Inc. ("Defendant" or "Exel")  and Plaintiff

Debra Blizzard ("Plaintiff" or "Blizzard").  Plaintiff is a former Exel employee; she has sued

Exel in connection with events arising during her employment at Exel, events that took place

following her six month medical leave in 2001-2002, and her eventual separation of employment.

The issues before the Court are: 1) Whether Plaintiff has established a prima facie CEPA

retaliation case and, if so, whether Exel's proffered explanation is pretextual; 2) whether Plaintiff has established that Defendant has engaged in racketeering activity and that she was injured therefrom; 3) whether Plaintiff has established that Exel failed to accommodate her pursuant to the NJLAD; 4) whether Plaintiff, an at-will employee, has demonstrated that she is entitled to relief pursuant to the doctrine of promissory estoppel; 5) whether Plaintiff has established that Exel wrongfully discharged her in violation of a clear mandate of public policy; and, 6) whether Plaintiff should be given leave to amend her complaint to assert a claim against Exel for FMLA interference.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332, 1367.  For the reasons set forth below, Plaintiff's motion for summary judgment is denied and Defendant's  motion for summary judgment is granted.

## I.      BACKGROUND

### A.  Exel

Exel is a logistics company that manages warehouses and distribution for other companies.   Whitehead Decl. ¶ 2.  Beginning in the 1980s and continuing through June 2002, Exel managed a warehouse in Bridgeport, New Jersey (the "Bridgeport Facility") for a company known as Becton, Dickinson and Company ("BD"), one of the world's largest suppliers of medical devices, laboratory equipment, and diagnostic products.  Id. ¶ 2.  At the Bridgeport Facility, Exel accepted, managed, and shipped BD product to BD customers throughout the United States and Europe.  Id.   The Bridgeport Facility operated twenty four hours a day, seven days a week.  Exel processed approximately 900 orders of product each day, with individual orders often consisting of hundreds of boxes of product.  Id. ¶ 3. The vast majority of orders were shipped by parcel and commercial carriers such as UPS and FedEx.  Id. On average, Exel

maintained approximately 180 employees at the Bridgeport Facility.  Id.

According to Kevin Whitehead, who was the Bench Manager of the Bridgeport Facility from August 2000 to December 2001, virtually all BD product arrived at the Bridgeport Facility on pallets[1] from the manufacturer who produced the product for BD.  Id.  ¶ 4.

**B.  Blizzard**

In 1987, Exel hired Blizzard as a warehouse worker of the Bridgeport Facility.  Def.'s Statement of Material Facts ¶ 23.  Throughout the course of her employment, Blizzard received no less than twelve written positive reviews and accolades, nearly twenty pay raises, and six promotions.  Id. ¶ 24.  In April 1997, Blizzard provided Exel with a doctor's disability certificate which indicated that she was suffering from anxiety and should perform only "light duty" and not operate heavy equipment.[2]  EXEL 0210, Def.'s. Ex. C.  In 1997, Exel altered Blizzard's work schedule so as to permit her to leave work early for approximately eight weeks to attend bereavement classes.  Def.'s Statement of Material Facts ¶ 27.  Beginning in August 1998, Exel provided Blizzard with a leave of absence to have knee surgery and recuperate therefrom.  Id. ¶ 28.  Blizzard returned from the leave of absence on January 11, 1999.  Id.  Upon Blizzard's return in January 1999 from her nearly five month leave of absence, Exel further accommodated Blizzard, according to her request and that of her doctor, by reassigning Blizzard from a warehouse position to a clerical/administrative position.  Id. ¶ 29.   In March 1999, Blizzard provided Exel with a doctor's disability certificate which indicated that she would be

---

[1]Pallets are portable platforms that are used to transport and store materials. The Merriam-Webster Dictionary 531 (1997).

[2]According to Exel, as a result of the certificate, it provided Blizzard with light duty for a one month period.  Def.'s Statement of Material Facts ¶ 26.

incapacitated from March 19, 1999 until March 24, 1999 due to a medical condition.[3]  EXEL

0196, Def.'s Ex. C.  In April 2000, Exel provided Blizzard two leaves of absence, one for own

health needs and the other to attend to her ailing husband.  Def.'s Statement of Material Facts ¶

31.  Between August 2000 and September 2001, Exel provided Blizzard with fourteen separate

leaves of absence, all attributable to Blizzard's or her husband's health conditions.  Id. ¶ 32.

On October 8, 2001,  Blizzard, then a clerical customer service representative ("CSR")

for the first shift,  underwent another knee surgery for which Exel provided Blizzard yet another

leave of absence.  Id. ¶ 36.   In February 2002, approximately four months after the surgery,

Blizzard provided Exel with a doctor's note dated February 7, 2002, which stated that Blizzard

was still unable to work and would not be able to work until after March 27, 2002, which was the

date of her next doctor's appointment.   EXEL 0129, Def.'s Ex. C.  By way of a doctor's note

dated March 27, 2002, Blizzard notified Exel that she would be able to return to work on

April 15, 2002. Def.'s Statement of Material Facts ¶ 40.  Blizzard returned to Exel on April 16,

2002, more than six months after her leave of absence commenced.  Id. ¶ 41. Blizzard wanted to

return to her position as a clerical CSR for the first shift, which was the position she held

immediately prior to having knee surgery in October 2001.  Blizzard First Dep. Tr. at 123:19-

126:17.   In that regard, Blizzard avers that when she "went out on medical leaves" in the past,

her "positions were held" for her, id. at 128: 19-22, and, further, that she had received assurances

that her job would be available for her upon her return to work from her leave following the knee

surgery of October 2001:

---

[3]According to Exel, as a result of the certificate, it provided Blizzard with another leave
of absence.  Def.'s Statement of Material Facts ¶ 30.

-I spoke to Nettie Whitehead, one of my supervisors, frequently during my leave which began in October 2001, and at no time did Ms. Whitehead indicate that my job was no longer available to me upon my return. Specifically, I remember that I spoke to Ms. Whitehead in January 2002 and Ms. Whitehead advised me that my job was still available to me. During my disability leave between October 2001 and April 15, 2002, Nettie Whitehead told me Debbie Scott, who normally worked in the warehouse, was just filling in for me until I returned.

-I spoke to Rosalind Robinson, Exel's Bridgeport HR person, at least five or six times during my leave which began in October 2001, and at no time did Ms. Robinson indicate my job was no longer available to me upon my return. Specifically, I remember that I spoke to Ms. Robinson in February 2002 and Ms. Robsinson advised me that Debbie Scott was *temporarily* filling my job.

-I spoke to Jack Hobson, one of my supervisors, frequently during my leave which began in October 2001, and at no time did Mr. Hobson indicate that my job was no longer available to me upon my return. On or about April 14, 2002, Mr. Hobson was still telling me that my job was available to me.
Blizzard Decl. ¶¶ 17-19.

Exel did not offer the first shift, clerical CSR position to her, however, because it claimed that it had been permanently filled; according to Plaintiff, the position was filled by by Deborah Scott ("Scott"), the person whom Plaintiff believed to be temporarily performing the first shift, clerical CSR position while she was on leave.  Def.'s Statement of Material Facts ¶ 42; EXEL 0121, Def.'s Ex. C; Blizzard First Dep. Tr. at 122:25 - 124:1, 125:12-25.  Instead of offering Blizzard the first shift, clerical CSR position, Exel offered her one of the following four options: 1) a job as UPS Tasker for the second shift (a job that would have resulted in a pay increase), 2) a job as an administrative assistant for the first shift (a job at a lower pay rate), 3) a job as a stock picker in any open position in the warehouse (a position that Blizzard previously held and which had the same pay rate as her previous position), or 4) a layoff.   Def.'s Statement of Material Facts ¶ 42. Pursuant to Blizzard's request, the offer was memorialized in writing. Blizzard First Dep. Tr. at 126:2-14; EXEL 0121, Def.'s Ex. C.  Dan Natkin ("Natkin"), Exel's Operations

5

Manager, gave Blizzard until Friday, April 19, 2005, to make a decision. Blizzard First Dep. Tr. at 126:12-17.

According to Whitehead, the UPS Tasker position offered to Blizzard, "was a desk job in which the employee directed, or 'tasked,' the stock pickers by computerized communication, as to what product to select for shipment." Whitehead Decl. ¶ 12. Blizzard rejected the position, and avers that the position involved "warehouse position work," which included standing and walking that she was physically unable to do. Blizzard First Dep. Tr. at 108:18-112:1. She admits that she did not consult her doctor about the position and did not ask anyone at Exel about using a motorized wheelchair if she accepted the job because she knew that she could not perform a "warehouse position." Id. She also admits that she preferred working in the first shift, rather than the second shift. Id. at 73:23-74:8.

Whitehead avers that "the administrative assistant position offered to Blizzard in April 2002 was a desk job." Whitehead Decl. ¶ 13. Blizzard did not accept this position although she concedes that she could have performed it. Blizzard First Dep. Tr. at 113:22-24. She avers that she did not accept this position because it was a temporary position that "was only for about two weeks and ... would be at a lower rate of pay" than her previous job. Blizzard Decl. ¶ 28. Whitehead avers that after Blizzard rejected this position, Marlene McCabe accepted it, "remained in the position until mid-June, after which she continued to work for Exel until the end of June 2002, when Exel ceased managing the Bridgeport Facility altogether. McCabe was then hired by Exel's successor at the Bridgeport Facility, Jenco." Whitehead Decl. ¶ 13. Blizzard avers that "McCabe was not hired to fill in [as administrative assistant.] She was hired for Customer Service IDS - Second Shift, and she continues to hold that position with Exel's

6

successor Jenco."  Blizzard Decl. ¶ 30.

The third type of position Exel offered Blizzard was a warehouse position as a  flow

picker or an IDS picker.  EXEL 0121, Def.'s Ex. C.  Blizzard avers that she rejected these jobs

due to her physical condition.  Blizzard First Dep. Tr. at 112:2-113:2.  While she admits that she

did not consult her doctor about these positions, she avers that she is "familiar with the position

of stock picker and [is] aware of no accommodations that would have allowed [her] to perform a

stock picker's tasks after four knee surgeries."  Blizzard Decl. ¶ 32-33.   She also avers that "[a]ll

of the warehouse jobs required repetitive lifting for 50 to 100 pounds" and that she "informed

[Natkin] that [her] restrictions prevented warehouse work because  [her] medical restriction

prohibited lifting (100 to 50 pounds repetitive), standing, walking long distances on the concrete,

bending and the cold conditions in the warehouse."  Id. ¶ 33.  Instead, Blizzard wrote Natkin a

letter dated Wednesday April 17, 2002, indicating she would accept the administrative assistant

position if it were a permanent position or any other full-time permanent administrative position.

EXEL 0129, Def.'s Ex. C.  Otherwise, she would accept a layoff.  Id.  Blizzard ultimately

accepted the layoff.

Blizzard also avers that while working for Exel, she engaged in certain whistleblowing

activities protected by law, and that she was retaliated against on that basis.  In that connection,

claims that she was asked to falsify certain information.  Blizzard First Dep. Tr. at 127:11-13.

BD had a system, the TRACIS system, which generates reports indicating whether Exel had

shipped orders to BD's customers.  Id. at 23:13-16.  Blizzard avers that she was asked to alter the

TRACIS report so that it indicated that certain orders had been shipped to customers, when, in

fact, they had not been shipped.  Id. at 23:13-32:2.  According to Blizzard, Exel has an agreement

to ship orders to BD's customers within twenty four hours, and "[i]f the shipments are made, the management and supervisors received bonuses." Id. at 53:13-54:2. Blizzard states that she complained to Joe Zeigler, John White and Michelle Burden and told them that she "should not be doing it, that it wasn't right." Id. at 42:25-43:18.  However, on every occasion that Blizzard entered what she believed to be incorrect information into the TRACIS report, she had been assured by a supervisor or manager that the information was "in accordance with BD," "satisfactory per BD," or "all right per BD." Id. at 48:8-52:13.  She also explains that on five occasions when she was asked to make a shipment report change but did not receive an assurance, she simply left work and went home instead of making the changes.  Id. at 44:23-48:3.

Moreover, when BD customers would issue complaints about having received an incorrect order, Blizzard would conduct an investigation to determine the veracity of the complaints.  Id. at 32:3-38:5.  Blizzard also avers that on a number of occasions she was asked by Nettie Whitehead and Jack Hobson to change the status of the complaints by reducing the number of overages and shortages.  Id. at 38:6-39:2.  Blizzard avers that by altering these complaints to make it look as though Exel had committed fewer errors, her superiors would receive bonuses, or higher bonuses.  Id. at 39: 3-23.   Blizzard admits, though, that Hobson and Whitehead conducted their own investigations as to the complaints.  Id. at  39:25-40:20.

Blizzard also avers:

During the time that I was complaining about the falsifications to various supervisors, Jim O'Brien the general manager, who replaced Scott Dintiman in 2000, told me I had to work in the warehouse on May 3, 2001, even though I told him it was against my doctors restrictions. I was dressed for office work that day and not warehouse work. Mr. O'Brien's response was to tell me that I had to work

8

in the warehouse and that [I] could see the doctor later.  Blizzard Decl. ¶ 50.

Blizzard concludes that Exel did not keep her position open for her because of "disability discrimination" and in retaliation for complaining about document falsification.  Blizzard First Dep. Tr. at 128: 6-12.

Exel disputes Blizzard's characterization of the facts or that she communicated her concerns to Exel.  According to Exel:

•   Blizzard failed to utilize any of the various Exel complaint mechanisms that were available to raise her alleged concerns about how her supervisors were characterizing shortages, including the "Associate Concern Resolution Process" and the "Work Line Direct" 1-800 number. Def.'s Statement of Undisputed Material Facts ¶ 19. Blizzard also failed to inform Exel Human Resources or BD of her alleged concerns.  Id.

•   The characterization of shortages as a unit of measure or counting issue had no effect whatsoever on an employee's eligibility for a bonus.  Id. ¶ 17.  Whether product shipped to the BD customers within twenty-four hours of their order had no effect whatsoever on an employee's eligibility for a bonus.  Id. ¶ 20.  Recording as shipped product that had not shipped had no effect whatsoever on an employee's eligibility for a bonus.  Id.

**C.  Procedural History**

On September 30, 2002, Blizzard filed her complaint against Exel, John Doe, and Jane Doe.  The twelve-count complaint asserted a laundry list of claims against Exel: CEPA, public policy tort, RICO (state & federal),  LAD and § 1981 race discrimination, Civil Conspiracy and 42 U.S.C. § 1985,  LAD handicap discrimination, workers compensation wrongful discharge in violation of public policy, workers compensation wrongful discharge in violation of state law, age discrimination, Retaliation, Promissory Estoppel and wrongful discharge. The case was

originally assigned to the Honorable Joseph E. Irenas, U.S.D.J.; on January 3, 2003, it was

reassigned to this Court.  Defendant filed the instant motion for summary judgment on May 13,

2005.  On July19, 2005, Plaintiff filed a cross-motion for summary judgment concurrent with her

opposition to Defendant's motion.  In her brief, Plaintiff voluntarily dismissed the following

claims against Exel: public policy tort, LAD and § 1981 race discrimination, Civil Conspiracy

and 42 U.S.C. § 1985,  workers compensation wrongful discharge in violation of public policy,

and workers compensation wrongful discharge in violation of state law and age discrimination.[4]

## II.    DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).   To avoid summary judgment the non-moving party

must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine

issue for trial.'" Celotex Corp., 477 U.S. at 324.   A genuine issue of material fact is one that will

permit a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).  In evaluating the evidence, the Court must "view the inferences

to be drawn from the underlying facts in the light most favorable to the [nonmoving] party."

Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002) (quoting Bartnicki v. Vopper, 200 F.3d

109, 114 (3d Cir. 1999)).  Conclusory allegations do not meet the non-moving party's duty to set

---

[4]The Court is constrained to note that Plaintiff's "everything but the kitchen sink" approach to pleading was not helpful to the resources of the Court or the other attorneys.

forth specific facts showing that a genuine issue of material fact exists and a reasonable

factfinder could rule in its favor.  Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir.

1999).

### B.  CEPA

Plaintiff has brought a claim against Defendant for retaliation in violation of New Jersey's

Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1, et seq.  CEPA was enacted

to "protect and encourage employees to report illegal or unethical workplace activities and to

discourage public or private sector employees from engaging in such conduct." Abbamont v.

Piscataway Twp. Bd. Of Educ., 138 N.J. 405, 431 (1994). The statute states at N.J.S.A. 34:19-3

that:

> An employer shall not take any retaliatory action against an employee because the
> employee does any of the following:
> a. Discloses, or threatens to disclose to a supervisor or to a public body an
> activity, policy or practice of the employer or another employer, with whom there
> is a business relationship, that the employee reasonably believes is in violation of
> a law, or a rule or regulation promulgated pursuant to law, or, in the case of an
> employee who is a licensed or certified health care professional, reasonably
> believes constitutes improper quality of patient care;
> b. Provides information to, or testifies before, any public body conducting an
> investigation, hearing or inquiry into any violation of law, or a rule or regulation
> promulgated pursuant to law by the employer or another employer, with whom
> there is a business relationship, or, in the case of an employee who is a licensed or
> certified health care professional, provides information to, or testifies before, any
> public body conducting an investigation, hearing or inquiry into the quality of
> patient care; or
> c. Objects to, or refuses to participate in any activity, policy or practice which the
> employee reasonably believes:
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law or,
> if the employee is a licensed or certified health care professional, constitutes
> improper quality of patient care;
> (2) is fraudulent or criminal; or
> (3) is incompatible with a clear mandate of public policy concerning the public
> health, safety or welfare or protection of the environment.

Because "[t]he elements necessary to prove a retaliatory discharge claim under CEPA are similar to those necessary to prove a violation of Title VII," principles from case law developed to enforce Title VII claims can be used in analyzing a plaintiff's CEPA claims. Bowles v. City of Camden, 993 F.Supp. 255, 261 (D.N.J. 1998). In McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973), the United States Supreme Court set down a burden-shifting standard for application in a Title VII cases.  First, the plaintiff must establish a prima facie case of retaliation by demonstrating that (1) he or she reasonably believed that his or her employer's conduct was violating either a law or a rule or regulation promulgated pursuant to law; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.  Kolb v. Burns, 320 N.J. Super. 467, 476 (App. Div. 1999); see also Dwonzar v. McDevitt, 177 N.J. 451, 462 (2003); Mosely v. Femina Fashions, Inc., 356 N.J. Super 118, 127 (App. Div. 2002); Bowles, 993 F.Supp. at 262. If a plaintiff is able to establish these elements, then the defendants must come forward and advance a legitimate, non-retaliatory reason for the adverse conduct against the employee. Zappasodi v. State, Dept. of Corrections, 335 N.J.Super. 83, 89 (App. Div. 2000); Kolb, 320 N.J. Super. at 479.  If such reasons are proffered, plaintiff must then raise a genuine issue of material fact that the employer's proffered explanation is pretextual. Bowles, 993 F.Supp. at 262; Kolb, 320 N.J. Super. at 479.

A plaintiff need not show that his or her employer actually violated a law, rule, regulation, or clear mandate of public policy, just that he or she reasonably believes that to be the

case. Dzwonar, 177 N.J. at 462-64; Estate of Roach v. TRW, Inc., 164 N.J 598, 613 (2000);

Gerard v. Camden County Health Servs. Ctr., 348 N.J. Super. 516, 522 (App. Div.), certif.

denied, 174 N.J. 40 (2002). The "determination whether the plaintiff adequately has established

the existence of a clear mandate of public policy is an issue of law." Mehlman v. Mobil Oil

Corp., 153 N.J 163, 187 (1998).

In order for a plaintiff to meet the threshold to withstand summary judgment under

N.J.S.A. 34:19-3c, he or she must "furnish the trial court with enough by way of proof and legal

basis to enable the court to determine as a matter of law" that the plaintiff has identified "the

asserted violation with adequate particularity" for a jury's consideration. McLelland v. Moore,

343 N.J. Super. 589, 601 (App. Div. 2001), certif. denied, 171 N.J 43 (2002).  To determine

whether a plaintiff has presented a viable CEPA claim under section 3c, a court must first

identify and enunciate the specific terms of a statute, rule, regulation, declaratory ruling,

professional code of ethics, or clear expression of public policy that the employee reasonably

believes would be violated if the facts as alleged are true and determine that there is a substantial

nexus between the complained-of conduct and the law or public policy identified by the court or

the plaintiff. Dzwonar, 177 N.J. at 464.  Judgment for a defendant is appropriate when no such

law or policy is forthcoming.  Id.  "CEPA requires judicial resolution of threshold legal issues

respecting existence of a statutory, regulatory or other clear mandate of public policy before the

trier of fact determines whether an employee has been retaliated against for acting upon an

objectively reasonable belief of the existence of such clear mandate by objecting to or refusing to

perform acts in violation of the mandate." Fineman v. New Jersey Dept. of Human Services, 272

N.J. Super 606, 609 (App. Div.), certif. denied, 138 N.J. 267 (1994); see also McLelland v.

Moore, 343 N.J. Super. at 601.

In Dzwonar v. McDevitt,177 N.J. 451, 469 (2003), the plaintiff, a union arbitration officer, alleged that her termination for refusing to acquiesce in the concealment of information from the general membership violated a clear mandate of public policy.  The New Jersey Supreme Court explained that the determination whether the plaintiff adequately has established the existence of a clear mandate of public policy is an issue of law and held that it could not "identify a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment that might have been violated by the Board's conduct." Id. Moreover, Plaintiff's argument that her reasonable belief that defendants' actions violated the Union's bylaws provided the basis for an actionable CEPA claim also failed because union bylaws are not a law, rule or regulation pursuant to CEPA, but rather a contract between the union and its members.  Id.

Indeed, "CEPA was enacted to prevent retaliatory action by an employer against an employee who blows the whistle on illegal or unethical activity committed by their employers or co-employers not to assuage egos or settle internal disputes at the workplace."  Klein v. University of Medicine and Dentistry of New Jersey, 377 N.J. Super. 28, 45 (App. Div. 2005)(internal quotations and citation omitted).  As mandated by Dzwonar, the Court must conduct an inquiry into a statute, regulation or clear mandate of public policy which has allegedly been violated to determine if the conduct is sufficiently linked to the statute, regulation or clear mandate of public policy.  See id. at 43.  Here, Plaintiff has testified that it was her belief that BD was being cheated by Exel because Exel was reporting orders that had yet to be shipped as though they had been shipped within twenty four hours.  Blizzard Aff. ¶ 49; Blizzard First Dep.

14

Tr at 53:13-56:3. However, Blizzard does not assert that the orders were never shipped to BD's customers, and, indeed, she testified that Exel met all of its quarterly shipment deadlines with BD. Blizzard First Dep. Tr at 53:13-56:3. Moreover, on every occasion that Blizzard entered what she believed to be incorrect information into the TRACIS report, she had been assured by a supervisor or manager that the information was "in accordance with BD," "satisfactory per BD," or "all right per BD." Id. at 48:8-52:13. Furthermore, nowhere has she identified any statute, regulation or clear mandate of public policy implicated here. Additionally, Plaintiff cannot simply rely on vague, self-serving statements which are unsupported by specific facts in the record to avoid summary judgment. See Heffron v. Adamar of New Jersey, Inc., 270 F.Supp. 2d 562, 574-75 (D.N.J. 2003). Therefore, even if the information that she entered was incorrect, her testimony alone does not sufficiently establish that she possessed a reasonable belief that Exel actually violated a law, rule, regulation, or clear mandate of public policy sufficient to satisfy the first prong of a prima facie case of a CEPA claim under the language or intent of N.J.S.A. 34:19-3c.

According to the third prong of the prima facie case, Plaintiff must show that an adverse employment action was taken against her. In that regard, Plaintiff is arguing that Exel constructively discharged her. "In a constructive discharge situation, the retaliatory action is the creation of intolerable conditions which a reasonable employee cannot accept." Daniels v. Mut. Life Ins. Co., 340 N.J. Super. 11, 17 (App. Div.), certif. denied, 170 N.J. 86 (2001). A constructive discharge "occurs when an employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 27-28 (2002) (citations and

internal quotation marks omitted) (alteration in original). The conduct complained of must be "so intolerable that a reasonable person would be forced to resign rather than continue to endure it." Id. at 28 (citation omitted). This "standard envisions a 'sense of outrageous, coercive and unconscionable requirements.' " Id. (quoting Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 428 (App. Div.2001)).

Plaintiff argues that Exel constructively discharged her because, upon her return from the sixth month leave, it did not offer her a permanent position that she was physically capable of performing.  Moreover, she argues that "Exel's supervisors and managers kept plaintiff out of an inventory control position, forced her to work in the warehouse in disregard of known disabilities resulting in serious bodily injury and surgery, and then finally forced her out of the facility so that her complaints would not hamper their fraudulent activities or come to the attention of [BD]." Pl.'s Opp. Br. at 22.  However, upon Blizzard's return, Exel offered her three jobs, one of which would have resulted in a pay increase and one which she admits that she was physically able to perform.  Nonetheless, Plaintiff rejected all these offers presumably because she wanted her old job back.[5]  Since Plaintiff refused to even consider or try any of the positions offered, Plaintiff is hard pressed to assert that these positions would have been so intolerable that a reasonable person would have felt compelled to resign.[6]  The Court finds that the conduct Plaintiff

---

[5]The Court notes that Plaintiff's contentions–that she was greatly troubled by Exel's alleged direction to falsify inputs, yet very much wanted her old job back–are seemingly at odds with each other.

[6]Defendant has also argued that to the extent that Plaintiff contends that two of the bases for her alleged constructive discharge are Exel's failure to transfer her to an Inventory Control position in April 2001 and that Exel "forced" her to work in the warehouse once in May 2001, these events cannot support a finding of a wrongful discharge since they are time barred.  While N.J.S.A. § 34:19-5 provides that "upon a violation of any of the provisions of [CEPA], an

complains of falls well short of that which must be established to constitute a constructive discharge.

Finally, to establish a <u>prima facie</u> case, Plaintiff must show that a causal connection exists between the whistle-blowing activity and the adverse employment action.  Plaintiff argues that "as a result of plaintiff's CEPA-protected activities, plaintiff suffered from a hostile work environment which ultimately led to the termination of her employment with defendant Exel." Pl.'s Opp. Br. at 27.  She explains that "Defendant Exel offers no believable nondiscriminatory reason for why plaintiff was sent into the warehouse in violation of her medical restrictions after complaining about the falsifications," "for why plaintiff was offered and then refused the inventory control position," and "for how plaintiff was treated upon her return to work in April 2002."  <u>Id.</u> at 27-28.  However, it is Plaintiff's burden to establish the causal connection; it is not Defendant's burden to disprove causation and the fact that throughout her employment, Blizzard received many raises, promotions, and positive reviews, the most recent of which came in May 2001, belies her contention that Exel retaliated against her because of her alleged whistleblowing activity.  Furthermore, Plaintiff even testified at her April 27, 2004 deposition that it was her

<hr/>

aggrieved employee or former employee may, within one year, institute a civil action in a court of competent jurisdiction," in <u>Daniels v. Mutual Life Ins. Co.</u>, 340 N.J. Super. 11, 18 (App. Div. 2001), the New Jersey Superior Court, Appellate Division distinguished between a termination and constructive discharge for purposes of when a plaintiff's CEPA claim accrues. The court held that in a constructive discharge case, the cause of action accrues at the point where a reasonable employee is compelled to resign due to the employer's action.  <u>Id.</u>  It is at that point that the employer has engaged in retaliatory conduct. <u>Id.</u>  Therefore, to the extent that Plaintiff is arguing that these two actions in concert are the bases for her constructive discharge, the Court finds that they are not time-barred because Plaintiff did not accept her layoff from Exel until April 2002 and filed suit on September 30, 2002.  However, for the reasons stated above, as well as those that follow, they, nor any of Plaintiff's other contentions, establish that Exel constructively discharged Plaintiff.

understanding that Exel did not offer her the inventory control position because no one was qualified for her job and the decisionmakers thought that Blizzard was performing her position well and did not want to remove her from it.  Blizzard First Dep. Tr. at 93:10-19.   Additionally, Plaintiff conceded that she was not aware of any open positions at Exel other than the ones offered to her.  Id. at 102:23-25. Therefore, Blizzard has failed to demonstrate a causal connection.  Thus, Plaintiff's CEPA claim cannot survive summary judgment.[7]

### C.  RICO (state & federal)

Plaintiff is also asserting claims against Defendant pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), and N.J.S.A. 2C:41-1 to -6.2, the New Jersey Racketeering and Corrupt Organizations Act ("NJ RICO").  RICO section 1962(c) provides that: "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern racketeering activity or collection of unlawful debt." In order to survive the Defendant's motion for summary judgment, Plaintiff must demonstate the following elements of civil RICO: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Sedima, S.P.R.L., v. Imrex Company, Inc., 473 U.S. 479, 496 (1985).  Additionally, Plaintiff must demonstrate that she has been injured in her business or property as a result of the alleged racketeering activity. Id. A "pattern" of racketeering activity requires at least two predicate acts of racketeering. See 18 U.S.C. § 1961(5); Sedima, S.P.R.L., 473 U.S. at 496 n. 14. Section 1961 provides an exclusive

---

[7]Having found that Plaintiff cannot establish a prima facie CEPA case, the Court need not decide whether Exel's proffered explanation is pretextual.

list of those acts that can constitute racketeering activity for the purposes of pleading violation of RICO. See Annulli v. Panikkar, 200 F.3d 189, 199 (3d Cir. 1999). The predicate acts that Plaintiff here is relying upon in attempting to establish a violation of RICO are mail and wire fraud. Pl.'s Opp. Br. at 46.

In Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992), the Supreme Court interpreted § 1964(c) to mean that a RICO plaintiff must show that defendant's RICO violation was not only a "but for" cause of his injury, but also that it was the proximate cause. Then, in Beck v. Prupis, 529 U.S. 494, 507 (2000), the Court held "that a person may not bring suit under § 1964(c) predicated on a violation of § 1962(d) for injuries caused by an overt act that is not an act of racketeering or otherwise unlawful under the statute." The Court held that a plaintiff needed to allege that he or she was injured by "an act that is independently wrongful under RICO," Beck, 529 U.S. at 505-06, and not merely by a non-racketeering act in furtherance of a broader RICO conspiracy, id.

NJ RICO provides in pertinent part:

It shall be unlawful for any person who has received any income or derived, directly or indirectly from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of the income, or the proceeds of the income, in acquisition of any interest in, or the establishment or operation of any enterprise which is engaged in or the activities of which affect trade or commerce. N.J.S.A. 2C:41-2(a).

NJ RICO defines "racketeering activity" as any one of the criminal offenses enumerated in N.J.S.A. 2C:41-1a(1), including "forgery and fraudulent practices and all crimes defined in chapter 21 of Title 2C." N.J.S.A. 2C:41- 1a(1)(o). The section of NJ RICO that confers a right of private action provides that: [a]ny person damaged in his business or property by reason of a

19

violation of N.J.S. 2C:41-2 may sue therefore in any appropriate court and shall recover threefold any damages he sustains and the cost of suit, including a reasonable attorney's fee, costs of investigation and litigation. N.J.S.A. 2C:41-4(c).

Interpreting this provision in <u>Interchange State Bank v. Veglia</u>, 286 N.J. Super. 164, 178, (App. Div. 1995) (citations omitted), <u>certif. denied</u>, 144 N.J. 377 (1996), the New Jersey Superior Court, Appellate Division held that "[i]n order to establish standing to institute a civil action under NJRICO, it must be shown that 'plaintiff's harm was proximately caused by the NJRICO predicate acts alleged, <u>i.e.</u>, that there was a direct relationship between plaintiff's injury and defendant's conduct.' " This requires a showing not only that the offender's alleged NJRICO violation was the "but for" cause of the plaintiff's injury, but also that the violation was the proximate cause. <u>Id.</u> (citing <u>Holmes v. Sec. Investor Protection Corp.</u>, 503 U.S. 258, 265, 268, 269-70 (1992) (requiring a showing of direct injury to demonstrate standing in light of the difficulty of ascertaining damages where the cause is indirect)).

Hence, in determining whether proximate cause has been demonstrated, the Court must examine the chain of events to determine who was directly injured by the predicate NJ RICO acts. <u>Interchange State Bank</u>, 286 N.J.Super. at 180.  If a plaintiff is harmed only in an indirect way by the acts constituting the predicate NJ RICO violation, the plaintiff does not have standing to pursue a civil NJ RICO claim. <u>Id.</u>; <u>accord</u> <u>Imagineering, Inc. v. Kiewit Pac. Co.</u>, 976 F.2d 1303, 1311 (9th Cir. 1992), <u>cert. denied</u>, 507 U.S. 1004 (1993); <u>Prudential Ins. Co. of Am. v. U.S. Gypsum Co.</u>, 828 F.Supp. 287, 296 (D.N.J. 1993).

Here, notwithstanding Plaintiff's assertion that Defendant committed mail and wire fraud by falsifying shipping reports, the Court perceives no basis for concluding that any of the conduct

20

complained of by Plaintiff would support a finding of a violation of any of the criminal offenses proscribed by chapter 21 of Title 2C or any of the other offenses set forth in N.J.S.A.143 2C:41-1a(1) or would constitute a predicate racketeering activity under § 1961 of RICO.  Moreover, if the Court were to assume, arguendo, that Exel engaged in racketeering activity, the only act that harmed Plaintiff was her alleged constructive termination, and Beck makes clear that a termination in furtherance of a RICO conspiracy cannot serve as a predicate for a civil RICO suit unless the termination itself is a direct § 1962(a)- (c) act of racketeering, which is clearly not the case here.  See Beck, 529 U.S. at 505-07.  As a result, Plaintiff cannot establish the requisite proximate cause, nor can she establish that she has RICO standing.

Furthermore, N.J.S.A. 34:19-8 provides that "the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law."  All of the facts that Plaintiff asserts in connection with her NJ RICO claim arise out of plaintiff's whistleblowing activities from which the resulting retaliation allegedly followed. Hence, the waiver provision of CEPA applies to this claim. Young v. Schering Corp., 275 N.J. Super. 221 (App. Div.1994), aff'd, 141 N.J. 16 (1995);  Casper v. Paine Webber Group, Inc., 787 F.Supp. 1480, 1509 (D.N.J. 1992) ("[W]here the only injury alleged from the New Jersey RICO claim is retaliatory discharge, such claim would also fall within CEPA's waiver provision.").  Therefore, Plaintiff's claims pursuant to RICO and NJ RICO cannot survive summary judgment.

**D.  NJLAD Disability Discrimination**

Plaintiff is also asserting a claim against Defendant for "disability discrimination" pursuant to the New Jersey Law Against Discrimination ("NJLAD").  NJLAD prohibits "any

unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment." N.J.S.A. § 10:5-4.1. Further, the New Jersey Administrative Code requires that an "employer must make a reasonable accommodation to the limitations of an employee or applicant who is a person with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship." N.J.A.C. tit. 13, § 13-2.5. This duty to accommodate, however, is subject to "an exception ... where it can reasonably be determined that an ... employee, as a result of the individual disability, cannot presently perform the job even with reasonable accommodation." N.J.A.C. tit. 13, § 13-2.8(a).

Blizzard claims that Exel violated her rights under NJLAD by denying her a reasonable accommodation. "Generally, a prima facie case of failure to accommodate requires proof that (1) the plaintiff had a LAD handicap; (2) was qualified to perform the essential functions of the job, with or without accommodation; and (3) suffered an adverse employment action because of the handicap." Bosshard v. Hackensack University Medical Center, 345 N.J.Super. 78, 783 A.2d 731, 739 (2001) (citing Seiden v. Marina Assoc., 315 N.J. Super. 451, 718 A.2d 1230, 1237 (1998)).

It is undisputed that Blizzard's temporary disability constitutes a handicap under NJLAD. See Soules v. Mount Holiness Mem. Park, 354 N.J. Super. 569, 808 A.2d 863, 865-66 (2002) (holding that a "temporary inability to work while recuperating from surgery or injury is a handicap" under NJLAD); see also Viscik v. Fowler Equip. Co., 173 N.J. 1, 800 A.2d 826, 835 (2002) (noting that "[t]he term 'handicapped' in LAD is not restricted to 'severe' or 'immutable'

disabilities and has been interpreted as significantly broader than the analogous provision of the Americans with Disabilities Act (ADA)").  As to the second element, however, Blizzard claims that she was unable to perform any of the functions of her job until April 2002.

The New Jersey Administrative Code provides an exception to an employer's obligation to provide a reasonable accommodation "where it can reasonably be determined that an applicant or employee, as a result of the individual's disability, cannot presently perform the job even with reasonable accommodation." N.J. Admin. Code tit. 13, § 13-2.8(a) (emphasis added). This provision of the New Jersey regulation reflects a significant difference between the ADA and NJLAD.  While the ADA applies to employees "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires," 42 U.S.C. § 12111(8) (emphasis added); see also 29 C.F.R. § 1630.2(m), NJLAD protects only an employee who can presently perform the essential functions of his job with or without the reasonable accommodation. The NJLAD regulation thus requires that the handicapped employee be able to perform the essential functions of his job during the application of the reasonable accommodation-- that is, at the same time that the reasonable accommodation is being implemented. The ADA, however, does not contain any such temporal requirement. Accordingly, the federal courts which have permitted a leave of absence as a reasonable accommodation under the ADA have reasoned, explicitly or implicitly, that applying such a reasonable accommodation at the present time would enable the employee to perform his essential job functions in the near future. See, e.g., Criado v. IBM Corp., 145 F.3d 437, 444 (1st Cir.1998) ("Criado offered evidence tending to show that her leave would be temporary and would allow her physician to design an effective treatment program.").

However, in Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 151 (3d Cir. 2004), the Third Circuit found that such reasoning is precluded under NJLAD because of the present performance exception.  In Conoshenti, as of the end of his FMLA-protected leave, the plaintiff was unable to perform any of the functions of his job.  The Conoshenti court declined "to hold that a temporary leave of absence must be granted under NJLAD to reasonably accommodate a handicapped employee's inability to presently perform the essential functions of his job because such a holding would effectively defeat the application of the present performance exception." Conoshenti, 364 F.3d at 151.  The court held that "requiring [plaintiff's employer] to grant Conoshenti a leave of absence as an accommodation following his FMLA leave would not have enabled him to presently perform his job; rather, it would have excused Conoshenti from present performance contrary to the explicit requirements of the NJLAD regulation."  Id.  The court explained that it was "confident that the New Jersey Supreme Court would not sanction such a conflict."  Id.

Instead of attempting to distinguish Conoshenti, Plaintiff's argument focuses on 29 C.F.R. § 1630.2(0)(3), an ADA regulation which provides: "To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  "Once a handicapped employee has requested assistance, it is the employer who must make the reasonable effort to determine the appropriate accommodation."  Tynan v. Vicinage 13 of Superior Court, 351 N.J.Super. 385, 400-01 (App. Div. 2002).  "To show that an employer failed to participate in the

24

interactive process, a disabled employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Id.

Plaintiff's argument focuses on her return to work.  She argues that "by failing to accept plaintiff's proffer of medical documentations supporting her continued restrictions, defendant Exel failed to engage in the interactive process."  Pl.'s Opp. Br. at 34.  Blizzard is arguing, in effect, that by offering her only warehouse positions and a temporary administrative position, as opposed to offering her old job back to her, Exel failed to engage in the interactive process.  However, there is no evidence that Exel, which offered Blizzard three different positions, did not make a good faith effort to find a job for her.  Moreover, Plaintiff is characterizing her request for her old job or a permanent, non-warehouse job at the same pay level, as a request for accommodations or assistance for her disability.  However, "'it falls to the employee to make at least a facial showing' that there were vacant, funded positions whose essential functions he was capable of performing," Mengine v. Runyon, 114 F.3d 415, 419 (3d Cir. 1997) (quoting Shiring v. Runyon, 90 F.3d 827, 832 (3d Cir.1996)), something which Blizzard has failed to do here. Indeed, the contrary is true; Plaintiff concedes that she was capable of performing at least one of the positions offered to her.  Additionally, Plaintiff admitted at her deposition that she was not aware of any open positions at Exel other than the ones offered to her.  Blizzard First Dep. Tr. at 102:23-25.  In short, Plaintiff is not alleging that Exel failed to accommodate her disability. Instead, she is engrafting her own unsupported definition of accommodation onto this case by

contending that she was entitled to the job of her choice--including hours and type of work.

Furthermore, according to Exel, Plaintiff's position had been permanently filled by another employee, and Exel's obligation to provide a reasonable accommodation did not require it to create a new job for Plaintiff.  See Mengine 114 F.3d at 417.  Finally, "there is nothing in the LAD that requires an employer to grant an employee who is unable to perform the essential functions of his job an extended leave of indefinite duration in the hope that the employee will one day regain the ability to perform the essential functions of his job." Davidson v. Atlantic City Police Dept. 1999 WL 533698 at *9 (D.N.J. June 28, 1999).  Simply put, Exel was not obligated to guarantee that Blizzard's job would be secure upon her return from indefinite leave or that she would be returned to exactly the same position.  Therefore, Plaintiff's LAD claim cannot survive summary judgment.

### E.  Promissory Estoppel

Plaintiff is also asserting a promissory estoppel claim against Defendant.  "There are four elements to the doctrine of promissory estoppel: 1) a clear and definite promise, 2) made with the expectation that the promisee will rely upon it, 3) reasonable reliance upon the promise, 4) which results in definite and substantial detriment." Lobiondo v. O'Callaghan, 357 N.J. Super. 488, 499 (App. Div. 2003). The definition of promissory estoppel is: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." Rest.2d. of Contracts § 90 (2004).  To succeed on a promissory estoppel claim, the plaintiff must establish that she took action that "amounted to a substantial change of position."

26

Kaufman v. Mellon Nat'l Bank and Trust Co., 366 F.2d 326, 332 (3d Cir.1996).

    In the context of at-will employment,[8] some courts do not recognize a cause of action for promissory estoppel.  See Peck v. Imedia, Inc., 293 N.J. Super. 151, 166 (App. Div.1996)(listing cases).   Other courts have allowed for such a cause of action when an employee has sued under promissory estoppel because she moved or left another job in reliance on an offer of employment which the employer later rescinded.  See id. at 166-67 (listing cases).  In Peck v. Imedia, Inc., 293 N.J. Super. 151, 167-68 (App. Div.1996), the New Jersey Superior Court, Appellate Division agreed with the latter courts, and held that even when a job is terminable at will, a promissory estoppel claim can arise from revocation of a job offer where there is denial of a good faith opportunity to perform after a prospective employee has resigned from an existing position in reliance upon a firm job offer.  While New Jersey has allowed for promissory estoppel claims in the context of at-will employment if certain limited facts exist, as was the case in Peck, none of those facts exist here.  Blizzard did not leave a job in reliance of an offer of employment which the employer later rescinded.  Other than Blizzard's own testimony, there is no evidence that a promise that her job would be held open for her was ever made.  Moreover, other than Plaintiff's own affidavit, there is no evidence that she detrimentally relied upon her belief that her position would be held for her because she admits that she returned to work as soon as she was able to do so.  In her affidavit, she avers:

    -If Exel had told me that after some point in time, my job would no longer be
    available to me, I would certainly have discussed with my doctor whether I could
    return to work before completing my course of physical therapy.
    -I would definitely have made any arrangements necessary to return to work at any
    time ten or twelve weeks after my surgery had ... Nettie Whitehead. Jack Hobson

---

[8]There is no evidence that Plaintiff had an employment contract.

and Rosiland Robinson not been telling me that my job would be there when I
returned.
-I could have arranged my therapy after work, which normally ended around 3:00
to 3:30 p.m. My doctor might have suggested other accommodations that would
have allowed me to return to work earlier if I had known that I needed to return
before a certain date or lose my job.  Blizzard Aff. ¶¶ 22-24.

These self-serving statements, which are unsupported by specific facts in the record, are not
enough to establish detrimental reliance, nor are they even enough to defeat a motion for
summary judgment. See Heffron, 270 F.Supp. 2d at 574-75.  Furthermore, Plaintiff cannot have
it both ways.  Either she was disabled and could not return to work sooner than April 2002, and
thus was entitled to a sanctioned leave of absence, or she was able to return to Exel at an earlier
date, but unnecessarily chose to extend her leave on a non-essential medical basis.  Therefore,
Plaintiff's detrimental reliance claim is dismissed.

### F.  Wrongful Discharge

Plaintiff is also asserting a claim against Exel for wrongful discharge.  New Jersey
recognizes a claim for wrongful termination of an at-will employee when the discharge is
contrary to a clear mandate of public policy. Pierce v. Ortho Pharm. Corp., 84 N.J. 58, 72 (1980).
An employee can prove a wrongful discharge claim by "show[ing] that the retaliation is based on
the employee's exercise of certain established rights, violating a clear mandate of public policy."
MacDougall v. Weichert, 144 N.J. 380, 393 (1996).  Sources of public policy include legislation;
administrative rules, regulations or decisions; and judicial decisions. Pierce, 84 N.J. at 72.
Whether a plaintiff has established the existence of a clear mandate of public policy is an issue of
law. Mehlman v. Mobil Oil Corp., 153 N.J. 163, 187 (1998). "A salutary limiting principle is that
the offensive activity must pose a threat of public harm, not merely private harm or harm only to

28

the aggrieved employee." Id. at 188.  The public policy must be "clearly identified and firmly

grounded.... A vague, controversial, unsettled, and otherwise problematic public policy does not

constitute a clear mandate." MacDougall, 144 N.J. at 391-92.  Unless an employee at-will

identifies a clear, specific expression of public policy, that employee may be discharged with or

without cause. Pierce, 84 N.J. at 72.  Here, there is no clear, specific public policy implicated by

the actions Plaintiff has identified; Exel's conduct affected Plaintiff only.  Furthermore, I already

found that Plaintiff cannot show that Exel retaliated against her.  See Discussion, supra § II, B.

Therefore, this claim cannot survive summary judgment.

### G.  FMLA Interference

In her Opposition Brief, Plaintiff contends that she should be given leave to amend her

complaint to assert a claim against Exel for FMLA interference.  Pl.'s Opp. Br. at 36, n. 3.

Federal Rule of Civil Procedure 15(a) gives a court discretion to allow amendment of a pleading

once as a matter of course, and provides that leave to amend "shall be freely given when justice

so requires." Fed. R. Civ. P. 15(a). After the first amendment of a pleading, a party may only

amend thereafter "by leave of court or by written consent of the adverse party...." Id. Interpreting

Rule 15(a), the Supreme Court stated:

> [T]his mandate is to be heeded. If the underlying facts or circumstances relied
> upon by a plaintiff may be a proper subject of relief, he ought to be afforded an
> opportunity to test his claim on the merits. In the absence of any apparent or
> declared reason--such as undue delay, bad faith or dilatory motive on the part of
> the movant, repeated failure to cure deficiencies by amendments previously
> allowed, undue prejudice to the opposing party by virtue of allowance of the
> amendment, futility of amendment, etc.--the leave sought should, as the rules
> require, be 'freely given.' Foman v. Davis, 371 U.S. 178, 182 (1962).

In Heyl & Patterson International, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.,

663 F.2d 419, 425 (3d Cir. 1981), cert. den. sub nom. F.D. Rich Housing of the Virgin Islands, Inc. v. Gov't of the Virgin Islands, 455 U.S. 1018 (1982), the Third Circuit stated that undue prejudice is the "touchstone" for denial of leave to amend. Undue prejudice occurs when the non-moving party is "unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the [moving party] been timely." Id. at 426 (citations omitted). Incidental prejudice is not a sufficient reason to deny leave to amend; rather, any resulting prejudice must be truly "undue." Id.

Absent a showing of undue prejudice to the non-moving party, "denial must be grounded in [the moving party's] bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure a deficiency by amendments previously allowed or futility of amendment." Heyl, at 425; see also Hewlett-Packard Co. v. Arch Assoc. Corp., 172 F.R.D. 151, 153 (E.D. Pa. 1997). In assessing the "futility" of an amendment, the Court "applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." MedPointe Healthcare Inc. v. Hi-Tech Pharmacal Co., 380 F.Supp.2d 457, 462 (D.N.J. 2005) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)).

The FMLA allows employees to take up to twelve weeks of necessary medical leave in a year without being placed in jeopardy of losing their jobs. 29 U.S.C. § 2601. The purpose of the FMLA is to "balance the demands of the workplace with the needs of families ... by establishing a minimum labor standard for leave" that allows employees to take a "reasonable leave for medical reasons." Churchhill v. Star Enter., 183 F.3d 184, 192 (3d. Cir. 1999). One theory of recovery under the FMLA is the entitlement, or interference, theory. It is based on the prescriptive sections of the FMLA which create substantive rights for eligible employees.

Hodgens v. Gen'l Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998).  Eligible employees are

entitled to up to twelve weeks of unpaid leave per year because of a serious health condition, a

need to care for a close family member with a serious health condition, or a birth, adoption, or

placement in foster care of a child. Id. (citing 29 U.S.C. § 2612(a)(1)). An employee is also

entitled to intermittent leave when medically necessary, 29 U.S.C. § 2612(b), and to return after a

qualified absence to the same position or to an equivalent position, 29 U.S.C. § 2614(a)(1).

These prescriptive rights "set floors for employer conduct." Hodgens, 144 F.3d at 159.

      An employee can allege that an employer has violated the FMLA because she was denied

the entitlements due her under the Act. 29 U.S.C. § 2615(a)(1), which makes it unlawful for "any

employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right

[under the FMLA]." 29 C.F.R. § 825.220(b) defines "interference" as including " not only

refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would

also include manipulation by a covered employer to avoid responsibilities under FMLA."  In such

a case, the employee only needs to show she was entitled to benefits under the FMLA and that

she was denied them. 29 U.S.C. §§ 2612(a), 2614(a). She does not need to show that the

employer treated other employees more or less favorably and the employer cannot justify its

action by showing that it did not intend it or it had a legitimate business reason for it. Hodgens,

144 F.3d at 159.  The action is not about discrimination; it is about whether the employer

provided its employees the entitlements guaranteed by the FMLA.  See 29 U.S.C. § 2615(a)(1)

      Here, Plaintiff asserts that the basis for her proposed FMLA interference claim is Exel's

failure "to advise plaintiff that her leave was considered FMLA leave and that her job would no

longer be held after the end of the twelve week period, and by then advising plaintiff that her job

was still available even into April 2002." Pl.'s Opp. Br. at 36, n. 3.  According to Plaintiff, this failure "interfered with plaintiff's ability to properly exercise her FMLA leave rights and take advantage of those federal protections."  Id.   Nowhere has Plaintiff identified a statute, regulation or case imposing this duty to "advise" on Exel.  Moreover, Plaintiff's surgery took place on October 8, 2001 and her FMLA leave expired twelve weeks later, on December 31, 2001.  Plaintiff returned to work on April 16, 2002, twenty six weeks after her surgery; upon her return, she was offered several different positions at Exel.  These facts do not give rise to an FMLA interference claim because nothing suggests that Blizzard was entitled to FMLA benefits that Exel denied.  Therefore, an amendment would be futile.

## H.  Jane Doe and John Doe

Plaintiff has never identified or moved to substitute anyone for the John Doe and Jane Doe Defendants, and discovery has concluded.   Therefore, those claims are dismissed.

## III.    CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

Dated: November  15 , 2005


S/ Freda L. Wolfson
Honorable Freda L. Wolfson
United States District Judge

32